1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RYAN BIGOSKI ODOM,                       No.  2:17-cv-0233 TLN AC P

12                      Petitioner,

13         v.                                 FINDINGS AND RECOMMENDATIONS

14   ANISSA DE LA CRUZ,

15                      Respondent.

16

17          Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the first amended petition

19   filed on January 2, 2019, which challenges petitioner's 2013 conviction for torture and first-

20   degree murder, with special circumstances of kidnapping with intent to kill and intentional

21   murder involving the infliction of torture.  ECF No. 25.  After respondent's motion to partially

22   dismiss the petition was granted (ECF No. 36), respondent filed an answer (ECF No. 40) and

23   petitioner filed a traverse (ECF No. 43).

24                              BACKGROUND

25   I.       Proceedings in the Trial Court

26          A. Preliminary Proceedings

27          Petitioner was charged in Solano County Superior Court with one count of murder (Cal.

28   Penal Code § 187(a)) and one count of torture (Cal. Penal Code § 206).  1 CT 1-2 (ECF No. 40-3

1   at 7-8).[1]  Petitioner pleaded not guilty, and the case proceeded to jury trial.

2          B.  The Evidence Presented at Trial

3          The jury heard evidence of the following facts.[2]

4          On May 13, 2011, police responded to a call that the body of a male, later identified as

5   Keith Osby, had been found in the bushes of the Masonic Lodge in Vallejo.  Neighbors had heard

6   a gunshot the night before, sometime between 11:30 p.m. and 12:30 a.m.

7          Osby's hands were tied and bound with duct tape behind his back, a bloodied blindfold

8   covered his eyes, and he had a gunshot wound to his head.  There was broken duct tape around

9   his ankles, and there were adhesive marks on his face, ears, mouth, and the back of his head.

10  Osby was dressed in jeans but wore no shirt or shoes.  There was a pool of blood under his head,

11  and he had "significant injury to his face and nose area."  His right eye was swollen shut, and his

12  right shoulder was bruised and discolored.

13         Susan Hogan, M.D., a forensic pathologist, performed an autopsy.  She noted Osby's

14  hands were deep red-purple and swollen below the binding, indicating he had been alive when he

15  was bound.  In addition to abrasions and contusions, he had a "railroad track injury," with two

16  parallel contusions, which was consistent with "being struck with something cylindrical such as a

17  baseball bat or police baton."  She concluded the cause of death was "gunshot wound to the head,

18  and blunt force trauma to the torso."  Osby had suffered massive hemorrhaging in the peritoneum,

19  but no major artery or vein had been compromised.  This indicated a "crushing injury," sheering

20  "lots and lots of little tiny vessels."  Dr. Hogan explained "[t]here [is] no way of stopping the

21  bleeding from a crush injury."  Even had Osby not been shot in the head, in her opinion he would

22  have died from the blunt force trauma.

23         Paul Herrmann, M.D., a forensic pathologist testifying for the defense, testified Osby died

24  of the gunshot wound to the head.  In his opinion it was "hard to say" whether the internal

25  _____

26  [1]  "CT" refers to the Clerk's Transcript on Appeal, Volumes 1 and 2 (Lodged Doc. 1 (ECF Nos.
    40-3, 40-4)).

27  [2]  This summary is adapted from the opinion of the California Court of Appeal.  Lodged Doc. 7 at
    2-8 (ECF No. 40-12 at 138-44); 244 Cal. App. 4th 237, 241-45 (2016).  The undersigned finds it

28  to be accurate.

bleeding "contributed at all" to Osby's death, and he believed Osby would not have died from internal bleeding had he not been shot.

The incident precipitating Osby's death was the theft of a PlayStation III and a computer from petitioner and her brother, Frank Bigoski. Petitioner and Bigoski lived in a house with many other residents, including Crystal Odom (Crystal),[3] Crystal's two sisters, Tina and Tenaya Odom, and Crystal's two minor brothers.[4] A number of other people stayed intermittently at the house, including petitioner's boyfriend Khalil Askari-Roberts (Khalil), Tina's boyfriend DaMarcus Armstrong and her best friend Jennifer Whittington, and Janiel Miller, a friend of Bigoski's. Osby, a former boyfriend of Tina's, also occasionally stayed at the house.

Petitioner and Bigoski were angry about the theft of the electronics and believed Osby was responsible. A neighbor had reported that two men, one of whom apparently matched Osby's description, had entered the house and left with "some stuff." Jeremy DeRemer, a friend of Osby's, told petitioner Osby tried to sell him a PlayStation and laptop.

Whittington testified petitioner had several conversations with her about the theft of the PlayStation and how angry she was about it.[5] As a ruse to get Osby to come to her house, petitioner asked Whittington to call him and ask if he wanted to participate in a robbery and "get a cut." Whittington called, but Osby declined the offer. Petitioner told Whittington to call him back and tell him he could just be the driver. Osby agreed to that proposal.

Osby and his brother arrived at petitioner's house around 4:00 p.m. on May 12. Petitioner hugged both of them, which she later told Whittington was to pat them down. Crystal then told Osby "not to go in the bedroom because [petitioner] was still mad about the Play Station" and thought he had stolen it. Osby denied stealing it and said the Odoms "were like family to him."

---

[3] Crystal described petitioner as her "mother," although she was not her biological mother. Crystal had been adopted by Harry Odom, her biological uncle, with whom petitioner had been in an 11-year relationship. When the two separated, Crystal stayed with petitioner, who became her legal guardian in 2009.

[4] Given their common last names, some of these individuals are referred to by their first names.

[5] Whittington testified pursuant to a plea agreement under which she would plead no contest to being an accessory to murder after the fact and would serve three years in prison in exchange for her truthful testimony.

Osby's brother left after about 25 minutes, and Whittington, who had recently taken the drug ecstasy, walked into one of the bedrooms with Osby.  Petitioner, Khalil, Tina, Bigoski, Miller, and Armstrong were already there.  Crystal testified that after Osby went into the bedroom and shut the door, she heard an "automatic thumping noise against the door," like "somebody was trying to get out."

Whittington testified petitioner began punching Osby with her fist "[r]ight as the door closed."  Whittington then blacked out, and when she "blacked back in," Osby was "kind of crouched in the corner, and [petitioner], Tina Odom and Khalil were all over him," hitting him. Whittington again blacked out, and when she came to, Osby was lying on the floor on his back with petitioner standing over and straddling him.  Petitioner was yelling, "You want to steal from our kids and have my daughter out there 'ho'ing.'"  Osby kept saying "Naw, mom, I'm not,"[6] and denied stealing the electronics.  Petitioner and Tina both kicked him, and Whittington noticed blood on the floor.  She felt sick to her stomach and left the room.  Whittington went into petitioner's bedroom, where Crystal had taken the younger children.

Approximately 10 to 15 minutes later, petitioner and Tina went to petitioner's bedroom and asked Crystal for tape, then returned to the bedroom Osby was in.  Whittington was very upset, and Crystal told her to stop being hysterical because she was scaring the children. Petitioner also told her to calm down and "quit acting stupid," and instructed her to stay out of the bedroom in which Osby was being held.

Miller, another resident of the house, testified he knew "an assault . . . was going to take place," but he "didn't expect [Osby] to end up dead."  At one point, Miller saw Bigoski leave the room, get a baseball bat, and hit Osby with it.  Bigoski then accidentally hit petitioner with the bat, and she told him to get rid of it.  After that, petitioner "kicked [Osby] a couple of times and then punched him a couple of times, and she got tired."  Bigoski, Armstrong, and possibly Khalil were holding Osby down while petitioner was hitting and kicking him.  Other than Bigoski hitting Osby one time with the baseball bat, the "only person that [Miller] remember[ed] seeing doing

---

[6]  The residents of the house called petitioner "Mom."  She was "in control" of the house, and Whittington did what petitioner told her to do.

4

anything as far as violence like that was [petitioner]."  Osby kept saying, "Why would you do this to me, Mom?"  Petitioner "started getting emotional," and Armstrong told her, "You need to get out of here."

Osby tried to escape out the window, but Armstrong and Bigoski prevented it.  Tina brought in some duct tape, and Osby "got taped, basically, hog tied."  Miller explained, "What I mean by hog tied, his hands were tied behind his back and his feet were behind his back taped."

Sometime later, Crystal went to the bedroom "to check with everyone."  She saw Osby "tied up on the floor."  His arms were tied behind his back, and his feet were tied with a white rag.  He had duct tape "around his whole head" and covering his mouth and "was beat up really bad."  It appeared he had a broken nose, and his face was "really swollen," his eye was swollen shut, he had lumps on his head, and was bleeding and crying.

Crystal saw the duct tape had been removed from Osby's mouth, and Janiel was giving him some water.  Osby was crying and asking to be released.  Crystal saw spots of blood on petitioner's shirt.  She told petitioner they should let Osby go, but petitioner said, "If we let him go, then he will come back and retaliate."

Petitioner then went next door and told the neighbor she had to "handle something" and was looking for a car to "drop somebody off someplace," "dump him someplace."[7]  Petitioner told her the person had been beaten up at her house, she had thrown the first punch, and after that, "everything went bad."  The neighbor "told [petitioner] if it was that bad, that she needed to take pictures so she [would] have proof that he left her house alive."  Petitioner told her neighbor she was worried about retaliation.

Petitioner returned to her house, went back to the bedroom, and then came out on the front porch where Whittington was sitting, asking whether Whittington knew anyone who had a car they could borrow.  When Whittington said no, petitioner had her call a cab.  She called the Fairfield taxi company where Khalil worked.  Petitioner then went to the taxi company with

---

[7]  The neighbor later testified she had been "mistake[n]" when she testified petitioner said she needed to "dump" Osby somewhere and claimed that she did not remember ever testifying at the 402 hearing that petitioner said she needed to "get rid" of Osby.

Armstrong.  Petitioner and Armstrong discussed what to do with Osby, and petitioner said, "What do you mean, don't even trip.  You got this idiot tied up at my house.  I could get in trouble.  I've got kids in my house, and you just want to leave him in there?"  She suggested they throw Osby off a bridge, and told Armstrong he needed to "take care of it."

After petitioner left, Crystal went back to the bedroom, where Osby was leaning against a couch and crying.  The tape had been removed from his mouth, and Osby said if they let him go he would not retaliate.  Crystal told him he would have to wait for Armstrong to return, because he "was in charge of the room."  Whittington was also there and helped Osby smoke a cigarette and gave him some water.  It looked to Whittington "like his nose was broken and one of his eyes [was] real puffed up and swollen to the point he could barely open it, and his lips were swollen."

Tina then called petitioner because Whittington was "being too nice" to Osby.  After getting petitioner on the line, Tina handed the phone to Whittington.  Petitioner "yelled" at Whittington, "[You] don't fucking listen," and told her to stay out of the room.  Osby remained bound in the room for at least two and a half hours.

A few hours later, between 10:00 and 11:00 p.m., a taxi van driven by Armstrong arrived at the residence.  Armstrong and Bigoski picked up the bound and blindfolded Osby and lifted him into the back of the van.  They also loaded Osby's shoes, shirt, sweater, and hat into the van, and Armstrong drove away.

Petitioner reappeared at her house around 6:00 a.m. the following day.  Crystal talked to her because she was upset that petitioner had put "everybody else at risk over a Play Station and a computer."  Petitioner admitted "beat[ing] the crap out of [Osby]," and told Crystal that Armstrong drove Osby to Richmond and shot him in the back of the head.  Crystal saw a metal baseball bat on the floor of the room where Osby had been held.

Petitioner told Whittington "that things got out of control, that they took proper action and that we just needed to go and act normal."  Petitioner said if the police came, Whittington should say Osby came to the house because she and Osby were supposed to go to Fresno, but he came and left.  Petitioner went "over the story" with the residents of the house.

////

A few days later, when Whittington learned Osby had been killed, petitioner told her she needed "to keep [her] mouth shut and say what she told [her] to say when the police come.  If not, it's not hard feelings.  [She] was going to be handled, too."  Whittington understood this to be a threat, meaning "if [she] didn't cooperate, that [she] would be killed like [Osby]."  When initially questioned by police, Whittington, out of fear, recounted the story petitioner had instructed her to tell.

Petitioner was interviewed four times by police.  Each time, she changed her description of the details surrounding Osby's beating.  She admitted directing Whittington to have Osby come to the house and admitted intending to "smack" him if he lied about the alleged theft of the PlayStation.  She acknowledged Osby's hands were duct taped.  She initially told police the beating lasted 45 minutes but later said it was only 10 to 15 minutes.

In her final interview, petitioner told police she had been looking for Osby for days before May 12.  She was angry and planned to "sock the shit out of him" if he lied about taking the PlayStation.  When Osby walked into the bedroom, petitioner "called him a bastard" and "slapped" him twice in the face.  She admitted telling Khalil he should throw Osby off a bridge but told police she did so "to lighten up my own mood at that point."  She denied telling anyone to kill Osby but admitted her comment to Armstrong that "you need to take care of it" could have been misconstrued.

C.  Outcome

A jury found petitioner guilty of torture (Cal. Penal Code § 206) and first-degree murder (Cal. Penal Code § 187(a)).  It also found true the special circumstances of kidnapping with intent to kill (Cal. Penal Code § 190.2(a)(17)) and intentional murder involving the infliction of torture (Cal. Penal Code § 190.2 (a)(18)).

D.  Sentencing

Petitioner was sentenced to life without the possibility of parole.  2 CT 460 (ECF No. 40-4 at 152).

II.   Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal modified the judgment to

7

1    add one additional day of custody credit and otherwise affirmed the judgment as modified on

2    January 26, 2016.  Lodged Doc. 7 (ECF No. 40-12 at 137-160).  The California Supreme Court

3    denied review on April 20, 2016.  Lodged Doc. 9 (ECF No. 40-12 at 216).  Petitioner did not

4    petition the United States Supreme Court for certiorari.  ECF No. 25-1 at 3.

5        While her direct appeal was pending, petitioner filed two pro se petitions for writ of

6    habeas corpus in the Solano County Superior Court.  ECF No. 25 at 18.  One petition was denied

7    on August 25, 2014, while the other was denied on November 19, 2014.  Id.  Petitioner's next pro

8    se state habeas petition was filed with the Solano County Superior Court on December 15, 2017,

9    and denied on February 7, 2018.  ECF No. 27-1 at 83-88.  Petitioner proceeded to file a pro se

10   petition for writ of habeas corpus in the Court of Appeal, First Appellate District (id. at 90-258),

11   which was denied on May 10, 2018 (id. at 260).  Petitioner then filed a pro se petition for writ of

12   habeas corpus in the California Supreme Court, which was denied without comment on

13   November 14, 2018.  ECF No. 25 at 2.

14       Petitioner's original habeas application was filed in this court on February 2, 2017.  ECF

15   No. 1.  Before any briefing on the claims took place, petitioner moved for and was granted a stay

16   under Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003).  ECF Nos. 13, 15.  After the stay was lifted,

17   petitioner filed an amended petition on January 2, 2019.  ECF No. 25.  As originally filed, the

18   amended petition merely supplemented the original petition, rather than standing on its own.

19   However, due to the length of both petitions, rather than order petitioner to file a single amended

20   petition, the Clerk of the Court was directed to attach the original petition to the first amended

21   petition.  ECF No. 26.  The resulting amended petition contained seven claims for relief: the four

22   claims contained in the original petition, plus three additional claims.  ECF No. 25.  The claims

23   from the original petition were designated Claims One through Four, while the claims added by

24   the supplemental petition were designated Claims Five through Seven.  ECF No. 32 at 3.

25       Respondent moved to dismiss all but Claims One and Three of the amended petition (ECF

26   No. 27), and the motion was granted (ECF No. 36).  Respondent answered Claims One and Three

27   on April 8, 2020 (ECF No. 40), and petitioner's traverse was docketed on June 22, 2020 (ECF

28   No. 43).  Petitioner has since filed a motion for clarification that seeks to amend the petition.

8

1   ECF No. 62.

2   MOTION FOR CLARIFICATION

3        Petitioner has filed a motion for clarification in which she requests clarification as to

4   whether she can add unexhausted Claim Two back into the petition on the ground that any

5   attempt at exhaustion would have been futile.  ECF No. 62.  She asserts that exhaustion would

6   have been futile because the state supreme court had consistently or recently rejected identical

7   claims, the state courts rejected an identical claim made by a co-defendant, and the state court's

8   reasoning in denying her other claims made it "virtually certain that they also would reject the

9   unexhausted claim."  Id. at 1.  She requests that she be permitted to add Claim Two back into the

10   petition.  Id. at 1-2.

11        In Claim Two, petitioner alleges that the trial court erred when it instructed the jury that it

12   had to find that petitioner acted with reckless disregard for human life in order to find the

13   kidnapping special circumstance true, when the law required intent to kill.  ECF No. 25-1 at 57-

14   64, 92-97.  In denying the claim, the court of appeals found that an instructional error had

15   occurred and proceeded to make a factually specific determination that the error in petitioner's

16   case was harmless beyond a reasonable doubt.  Lodged Doc. 7 (ECF No. 40-12 at 144-59).  Claim

17   Two therefore does not involve a purely legal question, and a futility argument is insufficient to

18   excuse exhaustion.  See Letner v. Broomfield, No. 1:18-cv-1459 JLT, 2022 WL 10626051, at *6

19   (E.D. Cal. Oct. 18, 2022) ("Federal courts have narrowly applied the futility doctrine as an excuse

20   from exhaustion, finding futility most appropriate where the state claims raise purely legal

21   issues." (collecting cases)).  Accordingly, petitioner's request to amend the petition to add Claim

22   Two back in should be denied.

23   STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

24        28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

25   1996 ("AEDPA"), provides in relevant part as follows:

26             (d) An application for a writ of habeas corpus on behalf of a person
             in custody pursuant to the judgment of a state court shall not be

27             granted with respect to any claim that was adjudicated on the merits
             in State court proceedings unless the adjudication of the claim –

28

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-82.  In other

1   words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182.

2   Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

3   confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d

4   724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims

5   summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a

6   state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

7   must determine what arguments or theories may have supported the state court's decision, and

8   subject those arguments or theories to § 2254(d) scrutiny. Richter, 563 U.S. at 102.

9                                    DISCUSSION

10  I.      Claim One: Insufficient Evidence to Support Torture Conviction and Torture Special
11          Circumstance Finding

12          A.     Petitioner's Allegations and Pertinent State Court Record

13          Petitioner contends that the evidence was insufficient to support the torture conviction and

14  torture special circumstance finding. ECF No. 25-1 at 40-57, 77-85, 106-12, 119-21. She argues

15  that because the beating was brief and was accomplished with only fists and feet, it was not an

16  attempt to cause severe and prolonged pain, which is an essential element of torture and the

17  torture special circumstance. Id. at 40, 53-55, 77, 107. She also argues that there was insufficient

18  evidence of the requisite intent because the victim's wounds were not severe and would not have

19  resulted in scarring or disfigurement, she never disclosed an intent to torture, the victim did not

20  suffer from excruciating pain, and the assault did not focus on vulnerable areas or evidence a

21  cold-blooded infliction of pain. Id. at 42-53, 77-80, 106-12. With respect to the torture special

22  circumstance, petitioner argues that there was insufficient evidence she intended to kill Osby

23  during the beating. Id. at 55-57, 81-85, 119-21.

24          B.     The Clearly Established Federal Law

25          Due process requires that each essential element of a criminal offense be proven beyond a

26  reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of

27  evidence to support a conviction, "the relevant question is whether, after viewing the evidence in

28  the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

1   elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

2   (1979).  If the evidence supports conflicting inferences, the reviewing court must presume "that

3   the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

4   resolution." Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground of

5   insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v.

6   Smith, 565 U.S. 1, 2 (2011) (per curiam).

7          C.  The State Court's Ruling

8          This claim was raised on direct appeal.  Because the California Supreme Court denied

9   discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

10  decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

11  501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

12         The state appellate court ruled in pertinent part as follows:

13         A.  The Torture Conviction and Torture Special Circumstance
               Finding
14

15         Defendant contends no substantial evidence supports her torture
           conviction or the torture special circumstance finding.

16         "In reviewing a claim for sufficiency of the evidence, we must
           determine whether, after viewing the evidence in the light most
17         favorable to the prosecution, any rational trier of fact could have
           found the essential elements of the crime or special circumstance
18         beyond a reasonable doubt.  We review the entire record in the light
           most favorable to the judgment below to determine whether it
19         discloses sufficient evidence—that is, evidence that is reasonable,
           credible, and of solid value—supporting the decision, and not
20         whether the evidence proves guilt beyond a reasonable doubt.
           [Citation.]  We neither reweigh the evidence nor reevaluate the
21         credibility of witnesses.  [Citation.]  We presume in support of the
           judgment the existence of every fact the jury reasonably could
22         deduce from the evidence.   [Citation.]   If the circumstances
           reasonably justify the findings made by the trier of fact, reversal of
23         the judgment is not warranted simply because the circumstances
           might also reasonably be reconciled with a contrary finding."
24         (People v. Jennings (2010) 50 Cal. 4th 616, 638-639, 114 Cal. Rptr.
           3d 133, 237 P.3d 474 (Jennings).)
25
           1.  The Torture Conviction
26
           Section 206 defines the crime of torture as follows: "Every person
27         who, with the intent to cause cruel or extreme pain and suffering for
           the purpose of revenge, extortion, persuasion, or for any sadistic
28         purpose, inflicts great bodily injury as defined in Section 12022.7

                                          12

upon the person of another, is guilty of torture.  [¶]  The crime of torture does not require any proof that the victim suffered pain."

Defendant maintains there is insufficient evidence of torture because "the beating involved a brief explosion of violence, not a cold and calculated attempt to inflict severe and prolonged pain."  She further claims there is insufficient evidence to "prove [she] had the specific intent to inflict cruel or extreme pain and suffering" because "Osby's visible wounds were not severe," "[t]here was no controlled, cold-blooded infliction of injuries to maximize Osby's pain," "[p]ain was not inflicted over a long period of time," and defendant "made no statements supporting the inference she wanted to torture Osby."

"Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain.  [Citation.]  Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain.  [Citations.]  [¶]  A jury may consider the severity of the wounds in determining whether defendant intended to torture."  (People v. Burton (2006) 143 Cal. App. 4th 447, 452, 49 Cal. Rptr. 3d 334.)  "The intent to torture 'is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds.'  [Citation.]  'We have, however, cautioned against giving undue weight to the severity of the wounds' [citation]; severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence."  (People v. Mungia (2008) 44 Cal. 4th 1101, 1137, 81 Cal. Rptr. 3d 614, 189 P.3d 880, italics omitted.)

"[Penal Code] section 206 does not require permanent, disabling, or disfiguring injuries; '[it] only requires "great bodily injury as defined in Section 12022.7" . . . .  "Abrasions, lacerations and bruising can constitute great bodily injury."'  [Citations.]"  (People v. Pre (2004) 117 Cal. App. 4th 413, 420, 11 Cal. Rptr. 3d 739.)  Moreover, as the court in People v. Hamlin (2009) 170 Cal. App. 4th 1412, 89 Cal. Rptr. 3d 402 explained, "no single act in the perpetrator's course of conduct may result in great bodily injury.  But where the cumulative result of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed . . . ."  (Id. at p. 1429, 89 Cal. Rptr. 3d 402.)

Ample evidence supports defendant's torture conviction.  She had been trying to find Osby "for a couple days" and orchestrated a ruse to lure him to her house for the admitted purpose of grilling him about the theft of the PlayStation and "sock[ing] the shit out of him" if he lied about taking it.  Defendant and her cohorts ambushed Osby as he entered the bedroom.  She admittedly struck the first blow and continued punching and kicking him for some 45 minutes.[n.7]  Osby was bleeding profusely, one eye was swollen shut, and his face was a battered mess.  Defendant then had him "hog tied" and gagged with duct tape, and he was left tied up in the room, bleeding and crying.[n.8]  When Whittington gave Osby some water and a cigarette, defendant "yelled" at her for being too "nice" to him.

13

Defendant also described such a graphic situation to her neighbor that the neighbor told her to take photographs to prove Osby was still alive when he left defendant's house.  Indeed, Osby suffered such massive internal injury he would have bled to death, even had he not been shot.  Defendant and Armstrong, who defendant had seen with a gun sometime "earlier in the week or a couple of weeks" then went to the taxi company where Khalil worked.  Defendant and Armstrong discussed what to do with Osby, and defendant suggested they throw Osby off a bridge and told Armstrong he needed to "take care of it."  The next day, she told Whittington they had taken "proper action" because they did not want Osby retaliating.  She later told Whittington to keep her mouth shut or she would be "handled too."

> n.7  Only later did she claim that the beating was for a shorter period of time.

> n.8  "Although evidence of binding, by itself, is insufficient to establish an intent to torture [citation], it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence [citation]; [People v. Proctor (1992) 4 Cal. 4th 499, 532, 15 Cal. Rptr. 2d 340, 842 P.2d 1100, . . .] ['victim was isolated and prevented from resisting or escaping'"].  (People v. Hajek and Vo (2014) 58 Cal. 4th 1144, 1188, 171 Cal. Rptr. 3d 234, 324 P.3d 88.)

Defendant cites to cases upholding torture findings in more egregious circumstances and concludes "there is no precedent for upholding a torture conviction based on the assault with fists and feet."  Torture, however, does not require a specific modality.  It requires the infliction of great bodily injury with the "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."  (§ 206)  There is no question there are cases in which the acts of torture were more gruesome.  However, "[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."  (People v. Thomas (1992) 2 Cal. 4th 489, 516, 7 Cal. Rptr. 2d 199, 828 P.2d 101.)  Here, there is no dispute Osby suffered great bodily injury (indeed, fatal injuries), and the purpose of its infliction was revenge for his allegedly stealing the electronics.  That the great bodily injury was inflicted with "fists and feet" does not negate the substantial evidence of intent to cause cruel or extreme pain and suffering.

### 2.  The Torture Special Circumstance Finding

Defendant contends the torture special circumstance finding is not sustainable because "there was insufficient evidence [she] intended to kill Osby when the beating was inflicted."  She claims the evidence showed, at most, that she did not decide to kill him until after the beating.

Section 190.2, subdivision (a)(18) provides in relevant part: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without

the possibility of parole if one or more of the following special circumstances has been found . . . to be true: [¶] . . . [¶] (18) the murder was intentional and involved the infliction of torture." "'To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.'" (People v. Hajek and Vo, supra, 58 Cal. 4th at p. 1187, 171 Cal. Rptr. 3d 234, 324 P.3d 88, citing People v. Streeter (2012) 54 Cal. 4th 205, 237, 142 Cal. Rptr. 3d 481, 278 P.3d 754, disapproved on other grounds as stated in People v. Harris (2013) 57 Cal. 4th 804, 834, 161 Cal. Rptr. 3d 364, 306 P.3d 1195.)

Defendant's argument founders on the premise the torture consisted solely of the brutal beating. Osby was tortured through a course of conduct that did not end with the last blow. Not only was he pummeled and kicked for approximately 45 minutes, but then he was gagged and hog-tied, and thereafter, still hog-tied, was imprisoned in the bedroom, crying and slowly bleeding to death. Osby remained there for a minimum of two and a half hours before he was tossed into the van along with his clothes. He was still trussed up when his body was discovered. Thus, the jury could well have found a course of conduct whereby Osby was tortured over a sustained period of time. (See People v. Bemore (2000) 22 Cal. 4th 809, 842-843, 94 Cal. Rptr. 2d 840, 996 P.2d 1152 ["we believe the Legislature, by employing the broader language of section 190.2, subdivision (a)(18), intended to encompass (within the torture-murder special circumstances) acts of torture occurring within a larger time frame, including those that would not have caused death"]; People v. Hamlin, supra, 170 Cal. App. 4th at p. 1429, 89 Cal. Rptr. 3d 402 ["where the cumulative result of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed"].)

Further, given the severity and duration of the beating, there was substantial evidence from which the jury could have concluded defendant formed the intent to kill during the beating itself, even if there was no evidence she had that intent at the outset. The severity of the beating and defendant's anger increased as the beating went on, to the point where Armstrong told defendant she needed "to get out of here." Defendant then went to a neighbor and described the incident in such graphic terms the woman recommended defendant take photographs of Osby to prove he was still alive when he left her house. Defendant, in turn, told her she needed a car to "dump him someplace."

Unlike the crime of murder by torture (§ 189), there is no requirement that the act of torture supporting a special circumstance finding caused the victim's death. "Proof of a murder committed under the torture-murder special circumstance requires (1) proof of first degree murder, (2) proof that the defendant intended to kill and torture the victim, and (3) proof of the infliction of an extremely painful act upon a living victim. [Citation.] The torture-murder special circumstance thus is distinguished from first degree murder by torture in that it requires defendant to have acted with the intent to

15

kill and applies where the death *involved* the infliction of torture, regardless of whether the acts constituting the torture were the cause of death."  (Jennings, supra, 50 Cal. 4th at p. 647, 114 Cal. Rptr. 3d 133, 237 P.3d 474, italics added.)

In Jennings, the defendant and his wife (mother) began abusing their son in mid-December 1995.  (Jennings, supra, 50 Cal. 4th at p. 628, 114 Cal. Rptr. 3d 133, 237 P.3d 474.)  Mother admitted "sock[ing]" the child between the eyes and knocking him out.  On Christmas day, a witness saw the child with his hand bandaged and was told the boy burned himself by touching the wood stove.  About two weeks later, the same witness saw the boy with a bruise "from the hairline down to the jaw line."  Another witness saw the boy in early January looking "'pretty beat up,'" with two black eyes, a bandaged hand, and an undernourished appearance.  (Ibid.)  In mid-January, while the defendant and mother were at the child protective services' office about a report they had made about a neighbor's child, mother asked if the social worker could find an adoptive home for their son.  (Id. at p. 629, 114 Cal. Rptr. 3d 133, 237 P.3d 474.)  About two weeks later, mother gave their son sleeping pills and Valium at defendant's request.  (Id. at p. 640, 114 Cal. Rptr. 3d 133, 237 P.3d 474.)  Later that day, when mother was not home, defendant "grabbed [their son] and struck him on the back of his head with a fireplace shovel."  (Id. at p. 629, 114 Cal. Rptr. 3d 133, 237 P.3d 474.)  The boy died within an hour.  (Ibid.)

On appeal, the defendant challenged the torture special circumstance finding on the ground there was insufficient evidence of his intent to kill.  Rejecting his argument, the Supreme Court explained he was "focusing entirely on [mother's] allegedly innocuous intent in giving [their son] sleeping pills," whereas the "[t]he relevant inquiry" was "*whether defendant harbored an intent to kill when he tortured* [*his son* ]."  (Jennings, supra, 50 Cal. 4th at p. 647, 114 Cal. Rptr. 3d 133, 237 P.3d 474, italics added.)  Moreover, "[t]he nature of the torture inflicted upon [his son]—the continuous infliction of serious and possibly life-threatening physical injuries while deliberately and systematically starving [him] to the point of emaciation—[was] sufficient to suggest that defendant had such intent."  (Ibid.)

Defendant focuses on the italicized language, arguing it requires evidence she "intended to kill Osby while she was beating him."  She also, again, myopically and mistakenly, focuses on the beating.  As the next sentence in Jennings, supra, 50 Cal. 4th at p. 647, 114 Cal. Rptr. 3d 133, 237 P.3d 474 makes clear, torture can consist of a course of conduct and the intent to kill need not be conjoined with every act within that continuum.  Moreover, as we have discussed, given the severity and duration of the beating, there was substantial evidence from which the jury could have concluded defendant formed the intent to kill Osby during the beating.

Accordingly, the torture special circumstance finding is also supported by substantial evidence.

Lodged Doc. 7 at 8-14 (ECF No. 40-12 at 144-50) (alterations in original).

1    D.  Objective Reasonableness Under § 2254(d)

2        Although the court of appeal did not cite <u>Jackson v. Virginia</u> in its analysis, it clearly and

3    accurately set out the standard for reviewing the sufficiency of evidence under federal law.  <u>See</u>

4    Lodged Doc. 7 at 8 (ECF No. 40-12 at 144) (citing <u>Jennings</u>, 50 Cal. 4th at 638-639).  Under

5    <u>Jackson</u>, the appellate court was obliged to view the evidence in the light most favorable to the

6    judgment and to consider all reasonable inferences in support of that judgment.  <u>Jackson</u>, 443

7    U.S. at 326.  The court of appeal's conclusions that there was sufficient evidence of petitioner's

8    intent to inflict severe and prolonged pain and to kill Osby—and that the intent to kill arose while

9    petitioner was torturing Osby—are not objectively unreasonable under that standard.  That any

10   jury conclusions regarding petitioner's subjective state of mind were necessarily based on

11   inferences from the circumstances does not undermine the verdict.

12       Given the significant amount of evidence supporting the charges, there is nothing

13   objectively unreasonable in the conclusion that the verdict was not irrational, and the state court's

14   resolution of the issue may not be disturbed by the federal court.  <u>See</u> <u>Boyer v. Belleque</u>, 659 F.3d

15   957, 964 (9th Cir. 2011); <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam) (state court need not

16   cite or even be aware of governing United States Supreme Court precedent for AEDPA deference

17   to apply).

18   II.    <u>Claim Three: Failure to Instruct Jury on Specific Intent for Torture Special
              Circumstance Violated Due Process</u>
19

20       A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

21       Petitioner argues that the jury instruction on the torture special circumstance failed to

22   instruct that the special circumstance could be found true only if the jury found that she had the

23   intent to kill Osby while she was inflicting the torture.  ECF No. 25-1 at 64-67, 85-92, 113-21.

24   She asserts that, when considered in conjunction with the prosecutor's closing arguments and the

25   instruction on murder by torture (CALCRIM No. 521), there was a reasonable likelihood that the

26   jury misunderstood the instruction.  <u>Id.</u> at 86-88, 117-18.  She further argues that the error was

27   prejudicial because, at most, the evidence showed that she formed an intent to kill Osby after the

28   beating was over.  <u>Id.</u> at 64, 66-67, 114-15, 120.

The jury was instructed as follows pursuant to CALCRIM No. 733:

> The defendant is charged with the special circumstance of murder involving the infliction of torture in violation of Penal Code section 190.2(a)(18).
>
> To prove that this special circumstance is true, the People must prove that:
>
> 1.  The defendant intended to kill Keith Osby;
>
> 2.  The defendant also intended to inflict extreme physical pain and suffering on Keith Osby while that person was still alive;
>
> 3.  The defendant intended to inflict such pain and suffering on Keith Osby for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason;
>
> AND
>
> 4.  The defendant did an act involving the infliction of extreme physical pain and suffering on Keith Osby.
>
> There is no requirement that the person killed be aware of the pain.

2 CT 346 (ECF No. 40-4 at 52).

### B.  The Clearly Established Federal Law

Claims of error in state jury instructions are generally matters of state law, and thus may not be considered on federal habeas review.  See Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993). Federal habeas relief is available only where instructional error violated due process by rendering the trial fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  Alleged instructional error "must be considered in the context of the instructions as a whole and the trial record."  Id. at 72 (citation omitted).  In challenging the failure to give an instruction, a habeas petitioner faces an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

### C.  The State Court's Ruling

This claim was exhausted on direct appeal, and the last reasoned state court decision is the opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d). Ortiz, 704 F.3d at 1034.

The state appellate court addressed petitioner's claim in a footnote to the section addressing her claim of insufficient evidence to support the torture special circumstance finding and held that "Defendant's claim that the instructions on the torture special circumstance were flawed because 'the evidence demonstrated [she] had no intent to kill when she beat and kicked Osby' fails for the same reason."  Lodged Doc. 7 at 14 n.9 (ECF No. 40-12 at 150).

D.  Objective Reasonableness Under § 2254(d)

While the state court briefly addressed this claim in a footnote, it incorporated the previous discussion related to the sufficiency of the evidence to support the special circumstance. Lodged Doc. 7 at 11-14 & n.9 (ECF No. 40-12 at 147-50).  The court of appeal reasoned in sum that the torture was comprised of a course of conduct that extended past the beating, and that the duration and severity of the beating was substantial evidence that petitioner formed the intent to kill during the beating itself.  Id.  It concluded that People v. Jennings, 50 Cal. 4th 616 (2010), on which petitioner relies on for the proposition that the intent to kill must have existed when the torture was inflicted, "makes clear [that] torture can consist of a course of conduct and the intent to kill need not be conjoined with every act within that continuum."  Id. at 149.

To the extent the court's holding was a determination that the instruction was correct under California law, that holding is unreviewable here and there can have been no fundamental unfairness such that it violated due process.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Where the jury was correctly instructed under California law, there is no federal due process violation.

To the extent the court's holding was a determination that any error was harmless, relief is available only if the state court's harmless error finding was itself objectively unreasonable.  Fry v. Pliler, 551 U.S. 112, 119 (2007).  In this case, the state court essentially found that it was immaterial whether petitioner formed the intent to kill Osby during or after the beating because "Osby was tortured through a course of conduct that did not end with the last blow" and "there was substantial evidence from which the jury could have concluded defendant formed the intent

19

to kill during the beating itself." Lodged Doc. 7 at 11-12 (ECF No. 40-12 at 147-48).  In other words, an instruction that petitioner had to form the intent to kill during the beating would have been improper because the torture was not limited to the beating, and a more general instruction that the intent to kill had to exist when the torture was inflicted would have made no difference to the verdict because there was substantial evidence that petitioner formed an intent to kill during the beating and, even if she did not, the torture continued after the beating.

 In reviewing an ambiguous instruction, "[i]f the charge as a whole is ambiguous, the question is whether there is a '"reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.'" Middleton v. McNeil, 541 U.S. 433, 437 (2004) (quoting Estelle, 502 U.S. at 72)).  Assuming arguendo that the trial court erred when it did not clarify that the intent to kill must have been formed while the torture was taking place, it cannot be said that this error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  The instruction provided that petitioner was "charged with the special circumstance of murder *involving* the infliction of torture." 2 CT 346 (ECF No. 40-4 at 52) (emphasis added).  It further instructed that to find petitioner guilty the state had to prove that petitioner "intended to kill Keith Osby," that she "*also* intended to inflict extreme physical pain and suffering," and that she "did an act involving the infliction of extreme physical pain and suffering on Keith Osby."[8] Id. (emphasis added).  The jury was also instructed with CALCRIM 251, which told the jury that to find petitioner guilty of the crimes she was charged with she "must not only intentionally commit the prohibited act, but must do so with a specific intent and mental state." 2 CT 310 (ECF No. 40-4 at 16).  CALCRIM 705 similarly instructed that with respect to the special circumstances the state had to prove both that petitioner "did the acts charged, but also that she acted with a particular intent or mental state." 2 CT 341 (ECF No. 40-4 at 47).  Taken as a whole, a juror would have understood these instructions to mean they had to find that when petitioner "did an act involving the infliction of extreme physical pain and

---

[8]  The requirement that petitioner's purpose was "revenge, extortion, persuasion, or any other sadistic reason" is not relevant to this analysis.

suffering on Keith Osby," she also had the intent to both kill and torture him, and there is no reasonable likelihood that the jury misapplied the instruction.  Petitioner's argument that the prosecutor's closing—in which "the prosecutor emphasized the jury did not have to find an intent to kill at the time the torture was inflicted"—would have further confused the jury is unconvincing.  ECF No. 40-12 at 120-21.  Those statements were clearly made while the prosecutor was addressing the elements for murder by torture as one of the three theories of first-degree murder being put forth by the state, and she later addressed the special circumstance by specifically stating that it required "that the defendant intended to kill Keith Osby."  5 RT 1309, 1324[9] (ECF No. 40-9 at 160, 175).

In light of the evidence of petitioner's guilt and the entirety of the jury instructions, the court cannot find that the alleged instructional error had a substantial and injurious effect or influence on the jury's verdict and habeas relief is not warranted.

<u>CONCLUSION</u>

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).

IT IS HEREBY RECOMMENDED that:

1.  Petitioner's motion for clarification (ECF No. 62) be construed as a motion to amend and DENIED; and

2.  The first amended petition for writ of habeas corpus (ECF No. 25) be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, she shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  <u>See</u> 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

---

[9] "RT" refers to the Reporter's Transcript on Appeal, Volumes 1-6 (Lodged Doc. 2 (ECF Nos. 40-5 to 40-10)).

21

within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 29, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

22